FLORENCE J. BAILEY, ADMX. *v.* CENTRAL VERMONT RAILWAY, INC.

May Term, 1942.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed November 4, 1942.

*Horace H. Powers* for the defendant.

*J. Ward Carver* and *T. Tracy Lawson* for the plaintiff.

SHERBURNE, J. This action is brought under the Federal Employers' Liability Act to recover damages for the death of Bernard E. Bailey resulting from attempting to open one of the hoppers of a coal car loaded with cinders at a dry bridge over a farm crossing about a mile and a half south of defendant's Williston station. The declaration alleges failure to provide a safe place to work, failure to furnish proper tools and appliances with which to open the hopper, failure to caution and warn Bailey of the dangers incident to the operation of opening the hopper, and failure to allow him sufficient time in which to perform the operation. Among other things the defendant pleaded the general denial and assumption of risk. At the close of all the evidence the defendant moved for a directed verdict on the ground, among other things, of failure to prove negligence on the part of the defendant and saved exceptions to the action of the court in overruling its motion.

Viewing the evidence in the light most favorable to the plaintiff, the following facts were fairly and reasonably within its tendency: Bailey, a capable and efficient workman, was about 25 years of age at the time of the injuries resulting in his death and had been a member of defendant's section crew at Montpelier Junction for about five years. A few days before the accident,

Bailey's section foreman instructed him to go on what is known as a work train, and on the morning of the accident he and one other member of his section went on this train to Williston, and were joined by the crews of the Bolton, Richmond and Williston sections. The train consisted of an engine, van, several cars containing track material, a derrick, and a hopper car of cinders. During the day they were engaged in unloading track material. In the late afternoon the hopper car was spotted on the dry bridge in such a position that it would dump the cinders through the railroad ties directly onto the roadway below the bridge. This bridge was about 18 feet above the ground beneath it, and the ends of the railroad ties upon it extended about 12 inches beyond the outside of the car. Across these ties was fastened a stringer or guard rail 8 or 9 inches wide which was set in 3 or 4 inches from the ends of the ties. The hoppers of this kind of a car are closed by a chain, which winds up on a shaft running crossways of the car, with a squared end formed like a nut to which a wrench is applied. There is a ratchet on the shaft and a dog on the side of the car which engages in the ratchet and holds the shaft tight when the hopper has been closed. To unload the car a wrench is applied to the nut at the end of the shaft and the man operating the wrench pulls its handle back towards him in order that the dog may be released from the ratchet. When the tension has thus been taken off, another man standing on the opposite side of the mechanism releases the dog either with his fingers, or if it sticks, with a hammer. As soon as the dog is disengaged the man who does that steps back and the man holding the wrench pushes back on it to open the hopper. When the hopper starts to open the wrench must be disengaged or let go of or the operator may be thrown off balance. The wrench furnished for opening hoppers was what is known as a frog wrench. It was a one piece, straight, heavy iron wrench with jaws open at the end and with a handle about three feet long. This kind of a wrench had been used for many years by defendant's employees for this purpose and no one had ever been injured in its operation. No one had ever seen Bailey open a hopper. Such an operation was usually performed by the older men in point of service. Bailey had been present on a very few occasions when hoppers were opened, and on previous such occasions was usually on top of the car shoveling down the cinders so as to completely empty the hopper. Other than what was said to him

just before the accident he had never been instructed in the use of the wrench for this purpose. Cinders had been dumped at this bridge each year for a number of years to replace cinders carried away from the roadway underneath by high water. Although Bailey had worked upon a work train a number of times there was no evidence of his familiarity with the dumping of cinders at this bridge. After the car had been spotted at the bridge one Muir of the Williston section brought a shovel and frog wrench from a section motor car, and when he was about 60 feet from the bridge Bailey said to him "I can take the wrench, you can take the shovel and go up in the car," and Muir gave him the wrench. After the wrench had been handed to Bailey, Muir heard some one say, "We had got just five minutes to unload the car", but he did not observe any hurry in unloading. After taking the wrench Bailey went out on the stringer on the bridge, and standing beside the car put the wrench on the nut of the car pocket, and pulled the handle of the wrench towards him, while one Stone, foreman of the Richmond section, went to help him and stood on the stringer opposite him and loosened the dog with a hammer, and then stepped back so that when the wrench was let go it would not hit him. When Stone stepped back and as Bailey started to open the hopper he said "Be careful the wrench doesn't catch you", and Bailey answered "I will" or something like that. When this warning was hardly out of Stone's mouth, Bailey pushed the handle of the wrench towards Stone, but the hopper didn't open the first time, so he gave the wrench another push and that time it opened quickly, and Bailey went off the bridge and fell to the roadway below and received injuries from which he died. Stone had never seen Bailey before that day. In applying the wrench to the nut and pulling back Bailey acted properly without coaching, and Stone was of the opinion that he acted as if he knew how to operate the wrench in opening a hopper. No one directed Bailey to open the hopper. For the purpose of showing whether the defendant furnished Bailey with a tool reasonably safe and reasonably adaptable to the purpose for which it was used, the plaintiff offered, and the court received, over the defendant's objection and exception, as an exhibit, a Swaco safety hopper car wrench. This wrench has a shorter handle than a frog wrench, and the part that fits over the nut turns in a large casing. The direction that it can so turn is controlled by a ratchet. There is a slot in the casing where the operator can move a

short lever with his fingers to reverse the direction. When turning up a nut the operator need not remove the wrench with each half turn as he must with a frog wrench, but at the end of the pull on the handle pushes back while the ratchet turns freely, and then when he pulls again the nut is turned further. It is plain enough that if the operator were closing the hopper of an empty car, where the nut has to be turned around several times, it could be done much more rapidly than with a frog wrench. As to whether this type of wrench is safer or better adapted to opening a hopper did not appear. One witness who had only used it to close hoppers said one of its purposes was to prevent the handle throwing when the nut on the hopper turns. Another witness who had used it to open hoppers said that his experience had been that it didn't operate too bad "if you didn't make a mistake and open the wrong ratchet; if you do, you are going places." This wrench costs $20.00 whereas a frog wrench only costs $1.50. It appeared that the defendant had purchased one of these wrenches before the time of the accident, and one afterwards, for use by the maintenance department in which Bailey was employed, as an experiment to see if it was any more useful than a frog wrench, and that the engineering department after a trial was uncertain whether the extra cost was justified. No section foreman had ever complained to the engineer in charge of the maintenance department about the usefulness of the frog wrench.

■■ We are here dealing with a Federal statute which supersedes all state laws covering the same field. *Mondou* v. *New York, N. H. & H. R. Co.,* 223 US 1, 56 L ed 327, 32 S Ct 169, 38 LRANS 44; *Robey* v. *Boston & Maine Railroad,* 91 Vt 386, 389, 390, 100 A 925. In proceedings under the Act the rights and obligations of the parties depend upon it and applicable principles of the common law as interpreted and applied in the Federal courts. *Chesapeake & O. R. Co.* v. *Kuhn,* 284 US 44, 52 S Ct 45, 76 L ed 157; *Robey* v. *Boston & Maine Railroad, supra.* The basis of recovery is negligence, without which no right of action is given under the Act. *Chesapeake & O. R. Co.* v. *Stapleton,* 279 US 587, 49 S Ct 442, 73 L ed 861. The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. *New York Central R. Co.*

v. *Ambrose,* 280 US 486, 50 S Ct 198, 74 L ed 562; *Toledo, St. L. & W. R. Co.* v. *Allen,* 276 US 165, 48 S Ct 215, 72 L ed 513.

■ As to the alleged failure to furnish a safe place to work the measure of duty is reasonable care having regard to the circumstances. The defendant's duty in respect to the space on the bridge for standing to open the hopper did not make it an insurer of Bailey's safety; there was no guaranty that the place would be absolutely safe; nor was the defendant required to have the space of any particular width or protected by a railing so as to be free from danger, as no employment is free from danger. *Missouri P. R. Co.* v. *Aeby,* 275 US 426, 48 S Ct 177, 72 L ed 351; *Toledo, St. L. & W. R. Co.* v. *Allen,* 276 US 165, 48 S Ct 215, 72 L ed. 513. Carriers, like other employers, have some freedom of choice in providing facilities and places for the use of their employees. Courts will not prescribe the space to be so afforded, nor leave such engineering questions to the uncertain and varying opinions of juries. *Toledo, St. L. & W. R. Co.* v. *Allen, supra.*

There was no evidence tending to show that the space on the bridge beside the cinder car was not a reasonably safe place under the circumstances in which to open the hopper. True, it was only about 12 inches wide and a misstep might cause a fall of 18 feet, but there was no claim nor evidence of accident when cinders had been previously dumped there or that on those occasions the operation was not performed on the bridge and in the same manner. It should be noted that this was an operation performed only once a year, and that the space afforded is not to be judged as though it were in everyday use for such purpose. *Stone* v. *Missouri P. R. Co.,* 293 SW 367.

■ The plaintiff makes the point that there was a safer way to dump the cinders under the bridge, and that the hopper could have been opened before spotting the car on the bridge and then the car could have been drawn onto the bridge. By doing it this way some of the cinders would necessarily have been deposited on the track and would have had to be shoveled onto the roadway below the bridge. As shown below, relative to a choice of tools, the defendant had a choice how it would do the work so long as the way employed was reasonably safe.

■ As to the alleged failure to furnish proper tools and appliances, the employer is under a duty to exercise ordinary care to supply appliances reasonably safe and suitable for the use of the

employee, but is not required to furnish the latest, best and safest appliances, or to discard standard appliances upon the discovery of later improvements, provided those in use are reasonably safe and suitable. *Chicago & N. W. R. Co.* v. *Bower,* 241 US 470, 36 S Ct 624, 60 L ed 1107. A frog wrench had been used for many years to open hopper cars without accident, and there was no evidence that it was not reasonably safe and suitable for that purpose.

■■ As to the duty to caution and warn, we accept the rule set forth in plaintiff's brief, that "it is the duty of a master to instruct and caution his servant regarding a risk of employment of which the latter is excusably ignorant. A master does not comply with his obligation to warn a servant of latent dangers by informing him generally that the employment is hazardous." *Sanderson* v. *Boston & Maine Railroad,* 91 Vt 419, 101 A 40; and *Carleton* v. *Fairbanks & Co.,* 88 Vt 537, 546, 93 A 462, are cited in support of this rule, and the latter case also says that a master is under no duty to warn a servant of ordinary intelligence of dangers which are obvious, but, in determining what dangers are obvious, the experience or lack of experience of the servant must be taken into account.

It is obvious that when the door at the bottom of a hopper is free to open the weight of the material in a loaded car will exert such pressure as to open it quickly, and that this opening will cause the supporting chain in unwinding to spin the shaft with the nut on the end. Bailey, a competent workman with five years' experience as a section hand, must have observed many hopper cars and noted their construction. Even if he had been present only a few times when a hopper was opened and on those occasions was usually on top of the car shoveling down the cinders that stuck on the sides of the hopper, he could not have failed to observe that the door opened quickly, and he must have known that that would spin the shaft. It is significant that in applying the wrench to the nut and pulling back so that the dog could be released he performed the operation correctly. His later pushing the handle of the wrench from him shows that he knew that the shaft must turn away from him to let the door open. It is inconceivable that as an experienced workman he did not know what was likely to happen when the hopper began to open. He was standing where, as he knew, he could not afford to take a wrong step or lose his balance. But, if any warning was necessary, Stone's caution was to the point and

timely. All that Bailey had to do when the hopper started to open was to let go of the wrench. Because of its jaws it would have fallen free if he had done so.

Moreover, as to the claim that Bailey had never opened a hopper before and was inexperienced in that regard, it should be noted that so far as appears he had a free choice as to whether he would go on top of the car as he had theretofore done or use the wrench. No one shown to be present knew of his claimed inexperience and it is impossible to see under the circumstances why the section foreman present who had never seen him before that day might not reasonably assume that he knew how to open the hopper or why he was under any duty to forbid his undertaking to open it.

No failure of duty in respect to caution and warning is shown. Nor does the evidence show that insufficient time was allowed for the operation.

█ The plaintiff insists that she is entitled to invoke the doctrine of *res ipsa loquitur*. In view of what is said in *Blaisdell* v. *Blake,* 111 Vt 123, 127-129, 11 A2d 215, there would seem to be no room for the application of this doctrine. Here, however, for aught that appears, the accident may have been due to improper handling of the wrench. The doctrine does not apply where the accident might have been due to improper handling as well as to improper furnishing the thing causing the accident. *Courtney* v. *New York, N. H. & H. R. R. Co.,* 213 F 388. Negligence is not shown.

The motion for a directed verdict should have been granted. In our disposition of the case it is unnecessary to discuss the other exceptions.

*Judgment reversed, and judgment for the defendant to recover its costs.*

JEFFORDS, J. (dissenting).

I do not agree with the holding of the majority that there was no evidence tending to show a failure to furnish Bailey with a reasonably safe place to work. In determining this question the situation should be taken as a whole. So taken, there is evidence from which the jury could reasonably have found that the defendant permitted its employee who had had no previous experience in opening

hoppers with firm ground for a footing to undertake this work for the first time in a dangerous place.

The evidence is undisputed that the distance from the floor of the bridge to the ground is about eighteen feet. Viewing the evidence in the light most favorable to the plaintiff the jury could reasonably have found that the only available footing that Bailey had was on a stringer which according to the evidence was eight or nine inches wide. Outside of the stringer the ties projected about four inches and thus could afford no adequate protection from a fall in the event that the workman lost his balance since the top of the ties was a few inches below the top of the stringer. To perform the work the only tool available, as far as the evidence discloses, was the frog wrench. I do not question but that this wrench may have been a proper tool to open hoppers in places where the cars would ordinarily be spotted but no testimony has been pointed out, and from a reading of the transcript I have found none to the effect that such a wrench had ever before been used under the circumstances here shown. It cannot be denied that it was a heavy, cumbersome tool. From the evidence it appears that there was no uniformity in the manner and result of using it to open hoppers. According to the testimony, one witness would let go of the wrench when the hopper started to open so that it would not catch and throw him off balance while another would hang onto it. It also appeared that some hoppers would open easily and others hard and if the wrench got away it would be apt to "snap down" the person who had been using it, and that "you have to either let go the wrench or else it will yank you down." Another witness testified that if you hang onto the wrench "it is liable to throw you"; and another that when the wrench is pulled back and the dog released that "if you don't look out you are liable to go down." Consequently, regardless of the question of whether the frog wrench was a proper tool to be used in opening hoppers under ordinary circumstances, the evidence above noted concerning it could properly be considered by the jury in connection with the evidence as to Bailey's lack of experience and his narrow foothold in determining whether he was furnished a reasonably safe place to work under all the circumstances disclosed.

The evidence as to the Swaco safety hopper wrench is also material on this point. There was evidence that the defendant owned several of them and that prior to the accident one had been al-

located to the maintenance of way department in which Bailey was employed. One of these wrenches was an exhibit in the case and it is apparent from an inspection thereof that the jury could have found that if Bailey had had such a wrench he could have made it impossible for it to pull him forward merely by shifting with his fingers the lever on the handle that controlled the ratchet. There was no evidence as to whether such a wrench was available for use by Bailey or other workmen at the time in question. The jury could reasonably have found that due care required the defendant to have one there for use and that the failure to so provide unnecessarily increased the danger of doing this work at the place in question. The fact emphasized by the defendant that the Swaco wrench cost $18.50 more than the frog wrench does not seem very important.

Moreover, there was evidence in the case to warrant the jury in finding that the hopper could have been opened before spotting the car on the bridge and that then it could have been drawn upon or across the same and by the use of a railroad tie as a drag a good share of the cinders would have been deposited under the bridge. The testimony of witnesses Morello and Lashua was to that effect. Counsel for defendant attempted on cross examination to break down the testimony of Lashua and have it appear that the only purpose or reason for opening the hopper and then moving the car so as to distribute the load would be to place the whole load over a long surface of track and not in one place. On re-direct examination this witness was asked whether it is entirely possible to open the hopper and then move the car and empty the cinders in one place and he answered that it was. No doubt some shovelling would have been necessary but a gang of about twelve men was available therefor and certainly the jury could reasonably have found that this way was safer than the one used. In determining whether in the exercise of due care it should have been employed, the question of its feasibility would arise but the evidence above noted would fully warrant an affirmative finding on that score. In my opinion this alternative method of dumping and distributing the cinders was a very material element for consideration by the jury in determining whether under the circumstances the defendant exercised reasonable care in furnishing a safe place to work.

The jury also could reasonably have found that the cinders were being dumped for no purpose connected with railroading but

merely to repair or restore the cattle way under the bridge which had been washed out and were so dumped at the request of the farmer who used this roadway. This view of the evidence is strenuously contended for by the defendant in support of its claim that Bailey was not engaged in interstate commerce at the time of the accident.

To summarize, the jury could reasonably have found that the defendant permitted Bailey, wholly inexperienced in opening hoppers, to perform this work for the first time in a dangerous place with a tool dangerous to be there so used and for a purpose not necessary to the maintenance of way of the defendant when a safer and feasible way could well have been employed. Certainly this finding would have warranted them in determining that the defendant had not fulfilled its duty, as laid down by the majority, of reasonable care, having regard to the circumstances, to furnish a safe place for Bailey to work at the time of the accident, but, to the contrary, they would have been justified in finding that the defendant by its negligence had made his place of work unnecessarily hazardous. The facts here do not disclose that the work was of an emergency nature nor that it necessarily had to be done in the way it was or within a limited time to keep traffic moving, reasons which might ordinarily be given for furnishing extra hazardous places to work. It is difficult for me to conceive of a stronger case for a plaintiff in support of this claim of negligence than the one here disclosed by the evidence.

The cases cited by the defendant on this claim of negligence are not in point. The gist of the defendant's argument is that this bridge was properly constructed and reasonably adequate to carry trains and that construction matters are for decision by the railroad and not by the courts. This line of argument, and the cases supporting it, are entirely beside the point. I do not question but that this bridge was properly constructed and adequate for the passing of traffic but surely the jury could find that it was not a proper place for the use to which it was put by the defendant on the day in question.

I now turn to the treatment by the majority of this claim of negligence. In my opinion they have not logically or effectively disposed of the same. Let us see how they have answered the evidence bearing on this point which they have set forth in their statement of facts and which I have added to somewhat by referring to

certain other evidence which I deem material. They have stated a few general principles of law, supported by cases with facts which they do not claim are at all similar to the ones here presented. I agree to the principles set forth but none of them bar the plaintiff in its claim on this point. They then make the statement "That there was no evidence tending to show that the space on the bridge beside the cinder car was not a reasonably safe place under the circumstances in which to open the hopper." In support of their statement they merely allude to the width of the space as being 12 inches. True, it was 12 inches if the projecting ties are taken into account but, as before shown, the jury could reasonably have found that the only space available for a foothold was that of 8 or 9 inches on top of the stringer. They then say "but there was no claim nor evidence of accident when cinders had been previously dumped there, or that on those occasions the operation was not performed on the bridge and in the same manner." One answer to this statement is that it was unnecessary for the plaintiff in order to prove negligence to show that the same procedure on the part of the defendant had previously resulted in injury. The dumping of cinders to which the majority refer covered a period of some few years and was done about once a year. Whether on those occasions the cinders were or were not dumped in the manner here attempted is not disclosed by the evidence. Even if on rare occasions the feat had been successfully accomplished this fact would have little if any probative value in determining the question of whether Bailey was furnished a safe place to work under the circumstances disclosed by the evidence.

The majority dispose of the claim that the alternative way of dumping the cinders was safer on the ground, apparently, that each was reasonably safe, but in so doing they beg the question. They hold, in effect, that the way taken was reasonably safe without, as far as it appears, taking into consideration the other method which, as before shown, was a material element for the jury's consideration in determining this very question of safe place. Then, after so holding, they say that the defendant had a choice of two reasonably safe ways so it cannot be considered negligent for employing the one it did. The fallacy of this reasoning is apparent.

I am also of the opinion that there was a jury question as to whether the defendant owed a duty to Bailey of adequate caution and warning. The defendant has not touched this point in either

of its briefs nor did it below in the argument on its motion for a directed verdict. Consequently, I need discuss only the reasons given by the majority for their holding that the evidence discloses no failure of duty in this respect. The answer to all of their statements in regard to what Bailey must have learned from his experience as a section man and the recital of what his actions showed in this respect, is that the evidence of his lack of experience in opening hoppers and the lack of uniformity in method and result of the same made a jury question on this point. It cannot be said as a matter of law, in view of this evidence, that the dangers inherent in the use of the wrench were so obvious as to relieve the defendant of its duty to caution and warn.

They also state that in view of the fact that he voluntarily took upon himself the work of opening the hopper and the lack of knowledge of the foreman of his inexperience, it is impossible to see why the latter could not reasonably assume that Bailey knew how to do the work, or why he was under any duty to forbid him to do it. The fact that the foreman did warn Bailey at the last moment was some evidence indicating that the foreman felt called upon to warn. Bailey was not known to the foreman. The jury might well have found that due care required him to ascertain Bailey's experience in such work before permitting him to undertake it in that dangerous place. There was ample evidence in the case to make a jury question on this point.

The majority say, however, that if any warning was necessary Stone's caution was to the point and timely. In my opinion the jury might reasonably have found that it was neither. Where the duty of warning and instruction exists, the employer must give such instructions and cautions as are sufficient to enable the employee to appreciate the dangers and the necessity for the exercise of due care and precaution to prevent injury to himself to the extent that this is possible by taking proper care. The question whether in the particular case the warning to or instruction of the employee was adequate or sufficient is, ordinarily, one for the jury's determination. 35 Am Jur 583, Sec. 152. Certainly it cannot be said as a matter of law that this warning was adequate and timely. It gave Bailey no instructions as to the proper use of the wrench at that place, nor any caution as to the result that might occur if he hung onto it after the hopper started to open, nor any warning that it might open easily or hard. The jury could well

have found the warning was not timely as it was not given until Bailey had started to open the hopper and they might have concluded that it had at that time the effect of confusing, rather than helping, him.

The following language appearing in the opinion in *Hayes* v. *Colchester Mills,* 69 Vt 1, 8, 37 A 269, 271, 60 Am St Rep 915, is much in point on this question of warning and caution: "It is said that the previous service of the plaintiff had been such that this employer was justified in assuming that he was fitted to undertake the work required of him. The length of time the plaintiff had been employed there, the nature of the work he had been engaged in, and the knowledge he had acquired of the machinery, were important to be considered by the jury, but afforded no basis for a conclusion of law. Inasmuch as the evidence tended to show that this was a service essentially different from any before required of him, it could not be assumed that his experience was such that instructions were unnecessary."

The fact that Bailey undertook this work voluntarily, while important on any questions of assumption of the risk or contributory negligence, cannot have the effect of making inapplicable the foregoing statements from the Hayes case, where the work in question was ordered done, on this question of defendant's negligence. Bailey was not a mere volunteer or interloper, but a workman, there to do whatever work was necessary, though possibly over-ambitious or even unwise in attempting the particular task which he undertook to perform. He was permitted, however, by the defendant to do it and the fact that he was not ordered cannot alter the responsibility of the defendant for the result. The statements made in that case apply equally to the situation here presented and are a sufficient answer to all that the majority say on this point and should be followed.

In their treatment of the claim of failure to furnish proper tools the majority state the applicable rule of law. They conclude their discussion on this point with another statement with which I find no great fault for, as before indicated, I am inclined to agree that the frog wrench may have been a proper tool to open hopper cars in places where they ordinarily would be spotted. Whether it was such a tool to be used by Bailey under the circumstances here shown is another question. I should also be inclined to agree that the ordinary plumber's blow torch is suitable for use under or-

dinary circumstances but I would not concede, and I doubt whether the majority would, that an employer could properly furnish it to his workman for use in a room filled with gasoline fumes. However, I have chosen to discuss the furnishing of the wrench in connection with the claim of failure to provide a safe place to work, rather than to treat it as an independent claim of negligence, so will refer to it no further.

In my opinion a jury question was presented as to negligence in respect of failure to provide a safe place to work, and to caution and warn, and the lower court was correct in submitting these issues and the jury was fully warranted in finding for the plaintiff on one, or both. In view of the holding of the majority there is no need to discuss the other questions raised by the exceptions.

BUTTLES, J. (dissenting).

I concur in the foregoing dissent but would add briefly thereto. It would seem that Bailey's fall must have been caused either by his slipping, by his being pulled by the wrench when the hopper opened, or by his losing his balance when it suddenly opened while he was pushing on the wrench. The immediate sequence of events was such as to raise a strong inference that Bailey's slipping, if he slipped, was caused by his exertion in doing the work in which he was engaged. If the fall was caused by his pushing on the wrench the defendant is not thereby absolved from negligence. It appears that there was often resistance to the opening of hoppers because they stuck. Bailey could not know in advance whether such resistance would be met, nor could he know how much force would be needed to overcome the same if there should be resistance. When the dog that held the hopper closed was removed, the weight of the material in the hopper and above it did not open it. It was necessary to use force and Bailey pushed on the wrench. The force used was not sufficient and the hopper did not open. Again he pushed, of course using such force as he thought necessary to accomplish his purpose. If he misjudged the amount of force necessary and as a result lost his balance, or if he slipped because of his exertion or if he was yanked or pulled by the wrench, the situation so far as this defendant's negligence is concerned is the same. The narrow footing gave him no chance to save himself.

Under the circumstances it could well be found that reasonable care was not used to furnish Bailey with a safe place in which

to do the work required to be done. That the various possibilities of the way in which the accident occurred are not set forth in detail by the plaintiff is immaterial. We seek to affirm the judgment below and it is our well established rule that when the result is an affirmance of the judgment it is immaterial that the plaintiff does not assert the ground of decision adopted in this Court. *Duchaine* v. *Phoenix,* 100 Vt 112, 116, 135 A 715.