**HILLEARY v. EARLE RESTAURANT,**
Inc., et al.
No. 1514–50.

United States District Court
District of Columbia
Dec. 31, 1952.

830

Albert Brick and Samuel Intrater, Washington, D. C., for plaintiff.

Welch, Daily & Welch, Washington, D. C. (J. Harry Welch), Washington, D. C., for defendant, Earle Restaurant, Inc.

Hogan & Hartson, Washington, D. C., (Paul R. Connolly), Washington, D. C., for defendant, Stanley Co. of America.

KEECH, District Judge.

This case is before the court on motions for judgment notwithstanding the verdict

or for a new trial, filed by both defendants following a verdict for the plaintiff.

Briefly stated, the facts are: On January 24, 1950, when the plaintiff, Mrs. Hilleary, with Mrs. Abbott and Mrs. Robinson, was leaving the Neptune Room, operated by the defendant Earle Restaurant, Inc., after lunching there, Mrs. Abbott slipped on the tiled entranceway adjacent to the sidewalk. Mrs. Robinson, who was in the middle of the group, tried to help Mrs. Abbott, on her left, and in "grabbing" at Mrs. Abbott, Mrs. Robinson struck Mrs. Hilleary, on her right, with her right elbow, causing Mrs. Hilleary to fall to the pavement and break her hip. Both Mrs. Abbott and Mrs. Robinson testified that after the accident they looked at the step and saw that it was moist or damp with muddy tracks. The official weather report for that day, made at the station at 24th and M Streets, N. W., indicates that there was .03 inches of rain between the hours of 3 and 6 a. m. and a "trace" between 6 and 7 a. m.

The doorway of the Neptune Room is recessed in the wall of the building, 30 inches back from the sidewalk. The area between the metal threshold and the sidewalk is paved with glazed ceramic tile. The threshold of the door is level, while the sidewalk slopes down hill. The east-west slope from the threshold to the sidewalk is negligible at the north end of the doorway, but at the south end the entrance slopes in a ratio of 1 inch to 10 inches, to compensate for the slope of the sidewalk. By reason of the combination of the two slopes, north to south and east to west, the middle area of the step has a dip or wavy depression.

The evidence showed that the doorway was constructed in its present form in 1939, when the present tenant leased the premises and they were remodelled for its purposes. The remodelling was done by the landlord, subject to approval by the tenant. The testimony was that the entrance was in 1950 and is at the present the same as it was constructed in 1939, except that the tile may have become smoother by wear over the years.

The plaintiff sued both the landlord, Stanley Company of America, and the tenant, Earle Restaurant, Inc., and recovered a verdict of $22,000 against both defendants.

The defendants base their motions on substantially the same grounds. Both contend that the verdict was not supported by substantial evidence; that it was contrary to the weight of the evidence; that the court erred in receiving evidence of other better materials available for use in entranceways, namely, so-called "non-skid tile"; that the court erred in instructing the jury; that the verdict was not unanimous and should not have been received by the court; and that the verdict is grossly excessive.

It is argued that there is no evidence that anything other than wetness of the tile caused Mrs. Abbott to slip; that she is the only witness who testified as to the cause of her slipping; and that the court's instruction that the jury must find for the defendants if it found Mrs. Abbott slipped because of the wetness, excluded from the jury's determination the only evidence as to the cause of her slipping and permitted the jury to speculate as to the cause of the accident.[1]

---

1. The pertinent parts of the charge read: "You have heard some testimony that the tiles of the entrance were damp, or wet, or muddy, at the time of the accident. You are instructed as a matter of law that there is not sufficient evidence that the defendant Earle Restaurant knew, or should have known, of any damp, or wet, or muddy condition of the tiles which may have existed when Mrs. Abbott slipped, in order for you to find the defendant Earle Restaurant was negligent in permitting the tiles to remain damp, or wet, or muddy."

And: "If you find that the entranceway was constructed in a reasonably safe manner by Stanley Company, and maintained in a reasonably safe manner by the Earle Restaurant, and that Mrs. Abbott slipped because of a wet, or damp, or muddy condition, then you must find for the defendants."

And again: "You are instructed as a matter of law that there can be no re-

832

When first questioned about the happening of the accident, Mrs. Abbott gave the following testimony:

"Q. Tell us what happened after you opened the door and walked out of the Earle Restaurant. A. As I got outside the door, on to the tile, I just felt my feet going from under me; they began to slip and I couldn't stop; it was as if I was on ice, and I began staggering to try to catch my balance, and then evidently when I hit that rough place in the pavement I lunged forward and tried to grab my sister to right myself.

"Q. Then what happened? A. She swung around to catch me and brushed against Nannie, I think.

"Q. And what happened to Nannie? A. Well, the first I knew—of course, it all was over in a minute, and I was thinking about myself, afraid I was falling, and then I saw Nannie lying sprawled on the pavement.

"Q. Can you tell us what caused you to slip? A. *I really don't know.* It was wet; I think I just slipped—it was like ice.

"The Court: Do you know or do you think?

"The Witness: What did you say?

"The Court: I understood you to say it was what you think. Do you know?

"The Witness: *I would say it was wet, because at the time I didn't notice it, but after standing there waiting for the ambulance I did glance back and saw that it was wet and muddy.*"

On cross-examination, Mrs. Abbott was asked:

"Q. I say you could see footprints in the dampness on the tile? A. It was mud that had been left on by people's feet.

"Q. Was it dried mud or dirt mixed with water? A. Dirt mixed with water.

"Q. By trackage from a person's foot, you say, is that right? A. Yes, sir.

"Q. Did you look for your tracks? A. No, indeed, I didn't.

"Q. Did you see any tracks left by your feet as you slipped? A. I didn't notice it.

"Q. And the thing which caused you to fall was this wetness on the tile; do I understand your testimony to be that? A. I don't think I was asked that question, as to what caused me to fall.

"Q. Is that your testimony? A. What did you say?

"Q. Is that your testimony, I am asking of you now. A. You are asking me now?

"Q. Yes. A. *Yes, I would say.*"

From a reading of the transcript of Mrs. Abbott's testimony as a whole, it is not unreasonable to conclude that the jury determined that, as she stated at the beginning of the direct examination, she did not actually know what caused her to fall, but that she did look back after the accident and saw that the tile was moist, a fact corroborated by Mrs. Robinson's testimony, and that on the basis of her observation of the dampness after the accident Mrs. Abbott concluded that was what caused her to fall. It is to be noted that Mrs. Abbott's first, spontaneous answer was that she did not know what caused her to fall, and that it was after being pressed by the court, and again by defense counsel on cross-examination, that she testified she "would say" she slipped because of the wetness or dampness of the tile. The jury may reasonably have determined that Mrs. Abbott was merely testifying as to her opinion as to what caused her to slip, and rejected that opinion.

The court's charge excluded the existence of wetness or dampness at the time of the accident as a possible act of negligence by either of the defendants, as to

covery against either the defendant Earle or the defendant Stanley if you find that the injuries sustained by the plaintiff, Mrs. Hilleary, were due to the wet, or damp, or muddy condition of the entranceway, which means that you have for your determination the question or questions, whether the entranceway was negligently constructed or maintained due to the type of construction or the material used."

Earle because of the lack of evidence as to notice, and as to Stanley Company because it could not be held liable on the basis of any negligent maintenance. This instruction did not eliminate the evidence of wetness or dampness as a possible proximate cause of the accident, but removed it from the jury's consideration as a proximate cause for which the defendants could be held responsible. The jury was clearly instructed that in order to find for the plaintiff it must find that Mrs. Abbott fell because of some act of negligence on the part of the defendants, either the tile surface, the grade, or a combination thereof. It was further instructed that there may be concurring proximate causes, and that a defendant whose negligent act concurs in proximately causing the harm is liable to the plaintiff for the whole amount of his damages. Although the charge included no instruction dealing specifically with the defendants' liability if wetness should be found to be a concurring proximate cause, the jury, in order to find for the plaintiff, had to find that the accident would not have occurred but for some negligent act by each of the defendants, other than a wet or damp condition; and under such circumstances, the mere fact that wetness might have shared in causing the accident would not relieve the defendants of liability.

The court's instructions concerning wetness or dampness were more favorable than the defendants were entitled to. The question might have been submitted to the jury whether it was negligence on the part of the defendants to construct and maintain an entrance paved with glazed ceramic tile or with a peculiar angle immediately adjacent to the sidewalk and open to the weather, where both defendants should have known it would be likely to become wet or damp and slippery when wet.

As the case went to the jury, the evidence of wetness or dampness, without refutation thereof, was favorable to the defendants in that the jury were instructed that if the accident was caused by wetness or dampness their verdict should be for the defendants.

We come then to the question whether there was any evidence other than wetness on which the jury might base a finding as to what caused Mrs. Abbott to slip. Mrs. Robinson testified that the tile sloped at quite a degree toward the sidewalk and was slippery because it was wet, indicating with her hands the degree of slope and stating that the photographs received in evidence accurately portrayed the degree of slope. Mrs. Abbott also testified that the condition of the entrance, other than wetness, at the time of the accident was the same as it appeared in the photographs. The witness Roberts, who testified as a tile expert, stated that the entrance is paved with plain ceramic tile, containing no non-skid material, that the angle of the entrance floor is as portrayed in the photographs, that the pavement of the entrance has a pitch from the doorway to the sidewalk of one inch to each 10 inches, with a "low spot" in the middle, and that it is 2 feet 6 inches wide, with a drop of three inches at the low end. Another tile expert, Mr. Troiano, testified that the entrance is paved with glossy ceramic tile, which contains no carborundum and feels as smooth as glass. This witness also testified that the more people who pass over tile of this type, the smoother it will feel to the touch. In addition to the testimony of these witnesses, the jury had the real evidence of the entranceway itself,[2] which it viewed by stipulation of counsel.

**2.** "When the condition or appearance of an object is material to the issue, the object itself may be produced in court, and its identity established, and it may be shown that it has existed in this state since the time when the issue arose. This object itself becomes real evidence of its condition at the time in question. Such inspection is proper, provided no specific reason of policy forbids. Under some conditions a jury may view the object, * * * with its environment. Reasons of convenience permit the trial court, exercising careful discretion, to suffer the object in question, when material to the issue, to be admitted in evidence before the jury as real evidence." District of Columbia v. Duryee, 29 App.D.C. 327,

In view of the court's instruction that the jury could not find either of the defendants liable if Mrs. Abbott slipped because the tile was wet, it must be concluded that the jury disagreed with Mrs. Abbott's conclusion and determined from the evidence as a whole that she slipped because of the slope of the entrance or the material with which it was paved, or these two factors in combination.

Counsel for defendants rely heavily on Brown v. Capital Transit Co., 75 U.S.App. D.C. 337, 127 F.2d 329, in support of their contention that to let the case go to the jury was to permit it to speculate on the cause of the accident. It should be pointed out that in the Brown case there was no evidence of any defect in the step on which the plaintiff tripped or other negligence on the part of the defendant, the only evidence being that the plaintiff fell in alighting from a streetcar, pulling the heel off her shoe, that she saw nothing wrong with the platform, that it had iron hobnails on it, and the plaintiff thought she might have caught her heel on the iron border of the platform or rough surface caused by the hobnails.

■ Here, there were three possible causes of the slipping—wetness, the peculiar slope, or the material of the ramp. With wetness ruled out by the court's instruction, the jury still had a right to consider whether the condition of the ramp due to its particular construction was negligence, and if so, whether such condition caused Mrs. Abbott to fall.

■ The plaintiff is not bound by Mrs. Abbott's testimony. Had the plaintiff herself testified incorrectly as to the cause of Mrs. Abbott's fall, she would not have been bound by her testimony as a judicial admission. Testimony must be regarded as evidence, not as facts admitted. The jury is entitled to resolve conflicting evidence, and plaintiffs have been allowed to recover for personal injuries on testimony which contradicted their own. Alamo v. Del Rosario, 69 App.D.C. 47, 49, 98 F.2d 328, 330.

331. See also Wigmore, Vol. IV, 3d ed., § 1162; Washington Coca Cola Bottling

As stated in Baltimore & Ohio R. Co. v. Postom, 85 U.S.App.D.C. 207, 208, 177 F.2d 53, 54:

"* * * If substantial evidence is presented, which, if credited, would sustain a verdict in favor of one party or the other, the case should be left to the jury. * * * If the evidence is conflicting, the conflict must be resolved by the jury. If divergent inferences may be drawn from the evidence, the selection of the proper deduction is also a function of the jury. * * * From the mere fact that the evidence permits two or more possible inferences, it does not necessarily follow that the evidence is not substantial and is not sufficient to sustain the jury's finding. To be substantial, the evidence need not point entirely in one direction. * * *"

The defendant Stanley Company argues that there is no credible evidence that the entranceway was constructed by it. However, it was the uncontradicted testimony of the witness Lurba, an officer of Earle, that Stanley Company remodelled the premises for Earle Restaurant at the time it entered into the lease.

The defendant Stanley Company further contends that as the lessor of leased premises over which the lessor has parted with dominion and control it is not liable for injuries to third persons from any defects existing thereon, either at the time of the lease or subsequently arising, citing Bowles v. Mahoney, D.C.Cir., 202 F.2d 320, and Lawler v. Capital City Life Insurance Co., 62 App.D.C. 391, 68 F.2d 438. Counsel argues that the Court of Appeals of the District of Columbia has not recognized any exception to the general rule where the lessor leases the premises for public purposes.

Bowles v. Mahoney, supra, involves a lease for residence purposes. In Lawler v. Capital City Life Insurance Co., supra, it is questionable whether the occupation of the building as the headquarters of a union was such a use for public or quasi-

Works, Inc., v. Kelly, D.C.Mun.App., 40 A.2d 85.

public purposes as to involve the patronage of large numbers of persons. However, assuming that it was such a public or quasi-public use, the case is distinguishable from the instant case. First, there is no indication that the plaintiff raised the question of the liability of a landlord to a business patron of the tenant injured on premises leased for public purposes. Second, the rationale supporting the doctrine which holds a landlord liable in such cases was inapplicable to the facts of the Lawler case, for there the owner, an insurance company, had recently acquired the premises for its own use as offices, but had not yet come into possession of the building, and the tenant was the former owner of the building who had been permitted by the new owner to remain in possession of its quarters for ninety days after the sale as a tenant by sufferance at a nominal rent. .

■ The exception to the general rule of non-liability of the lessor has been stated:

"Where premises are leased for public or semipublic purposes, and at the time of the lease conditions exist on the premises which render them unfit for the purpose intended or constitute a nuisance, and the landlord knows or by the exercise of reasonable care ought to know of the conditions, and a third person suffers injuries on account thereof, the landlord is held liable because such third person is there at the invitation of the landlord as well as the tenant. * * *" Fraser v. Kruger, 8 Cir., 298 F. 693, 696. See also Junkermann v. Tilyou Realty Co., 213 N.Y. 404, 108 N.E. 190, L.R.A.1915F, 700.

The situation where a former owner is permitted by the new owner to carry over its prior use of the premises as a tenant by sufferance until the latter can find other quarters, is not comparable with lease of premises by the owner expressly for public or semipublic use, and does not carry the same duty or responsibility to business patrons of the tenant.

Counsel for the defendant Stanley Company argue that the courts of this jurisdiction have not recognized any exception to the general rule of non-liability of a landlord for personal injuries sustained by a third person on the leased premises. The court has not been referred to any local case ruling on whether there is an exception applicable to a lease for public purposes; but our Court of Appeals has recognized another exception to the general rule of non-liability of the landlord, in Bailey v. Zlotnick, 80 U.S.App.D.C. 117, 149 F.2d 505, 162 A.L.R. 1108, in which it was held that even though a landlord may have no duty to repair leased premises, if he enters the premises through his agent to make repairs and by affirmative action on his part creates an unsafe condition, he is liable to the tenant.

Section 359 of the American Law Institute Restatement of the Law of Torts formulates the rule:

"A lessor who leases land for a purpose which involves the admission of a large number of persons as patrons of his lessee is subject to liability for bodily harm caused to them by an artificial condition existing when the lessee took possession, if the lessor (a) knew or should have known of the condition and realized or should have realized the unreasonable risk to them involved therein, and (b) had reason to expect that the lessee would admit his patrons before the land was put in a reasonably safe condition for their reception."

■ Counsel for defendant Stanley Company contends that if as to the lease of premises for public purposes there be an exception to the general rule of non-liability, the court erred in failing to include the proviso (b) stated in § 359 of the Restatement. This qualification of the exception to the rule was omitted by the court from its instruction because it was inapplicable to the facts in the instant

case.[3] The only unsafe condition which the jury could have found existed at the time the tenant took possession of the leased premises was the structural nature of the entrance floor, which was specifically remodelled by the landlord for the tenant. In such case, the landlord could have no reason to expect that the lessee would change the condition which had just been created expressly for him and with his approval.

Defendant Stanley Company makes a point that the witness Troiano testified that ceramic tile will become smoother as it is worn down by use, that the entrance is used by about 1200 people a day, and that there is no evidence that the tile was as smooth when it was installed by Stanley Company as it appears today. If the jurors based their verdict either entirely or partially on a finding that the surface of the tile is unreasonably slippery, rather than on the angle of the entrance, when they viewed the entrance they may well have observed both the areas of the tile which might be worn and the areas of tile immediately adjoining the side walls, where persons would not walk, and have based their verdict as to Stanley Company on the condition of the tile where it was not worn.

Defendant Earle Restaurant argues that with wetness ruled out of the case there is no evidence of negligent maintenance of the entrance by it. This contention overlooks entirely the uncontradicted fact that Earle was at the time of the accident and had been for over ten years in sole control of the leased premises, and had permitted the ramp to remain as it was remodelled, a condition which the jury necessarily determined Earle should have known was unsafe.

Both defendants argue the jury was not justified in finding that the entrance was not reasonably safe because approximately 1200 people each day pass through the door and this was the first accident that ever occurred there. The relief manager of the restaurant testified that she did not know of any other accident that had occurred at this entrance. In cases of personal injury, evidence of continued use of the alleged responsible agency without accident, immediately before and after the happening of the event, is generally held admissible as tending to prove the condition of the agency at the time of the accident in question. Lewis v. Washington Ry. & El. Co., 52 App.D.C. 243, 244, 245, 285 F. 977. However, evidence that no prior accident has occurred no more raises a conclusive presumption of due care, than evidence of a prior accident conclusively establishes negligence.

The defendant Earle Restaurant was given the benefit of the following instructions:

"The jury are instructed that for the plaintiff to recover from the defendant Earle Restaurant, Inc., it is not enough to show that the entranceway was improperly constructed or maintained in a dangerous or hazardous condition and that such condition caused the fall. If you should find that such condition caused the fall, it is essential also for the plaintiff to prove that the defendant had or should have had actual or constructive notice of such condition and that such notice had reached or should

3. The jury were instructed:
 "If the defendant Stanley Company rented the premises to the defendant Earle Restaurant, Inc., knowing they were to be used for restaurant purposes, the defendant Stanley Company had a duty to see that the premises were in a reasonably safe condition for such use at the time, 1939, it turned the premises over to the lessee, Earle Restaurant, Inc. * * * Stanley Company had a duty at the time it leased the premises for pub-

lic purposes to do what a reasonably prudent person would have done to see that the entrance was reasonably safe for patrons of the restaurant. * * *
 * * * * * *
 "In order for you to impose liability upon Stanley Company you must find * * * that the defendant Stanley Company knew, or should have known, that the entranceway when constructed, 1939, involved an unreasonable risk of harm to those who would use it."

have reached the defendant such a reasonable time before the accident that failure to remedy the condition was a failure to exercise reasonable care.

\* \* \* \* \* \*

"\* \* \* the fact that the evidence discloses no other accidents occurred in said entranceway either before or after the alleged accident in this case, is not a bar to recovery by the plaintiff, but is evidence that you may consider in determining the question of negligence, along with the other evidence in this case bearing on the question of negligence."

■ The next major assignment of error by both defendants is that the court admitted expert testimony of two persons familiar with tile work, one a general contractor and the other a tile setter, as to the availability of a safer type of tile. The testimony of these witnesses which was admitted reduces itself to the facts that there are several general classifications of tile; that the entranceway in question was paved with plain ceramic tile with a slick, glossy surface, containing no "non-skid" material; that there is available for entrances another type of ceramic tile, containing carborundum, so-called "non-skid" tile, the surface of which has a dull finish and is not slick; and that "non-skid" tile has been in common usage in the trade for the past twenty-five years. Counsel argue that the inevitable effect of this testimony was to permit the jury to find the defendant Stanley was negligent if it did not use "non-skid" tile in the entrance.

This evidence of improved materials was not admitted for the purpose of establishing a standard of conduct. The evidence concerning "non-skid" tile was admitted only to aid the jury in its determination of what a reasonable man would have done under the circumstances, in the light of available alternatives of conduct. The jury were instructed:

"Neither the Stanley Company nor the Earle Restaurant had the duty to use the latest, safest, and best construction or materials in constructing or maintaining the entrance involved in this case. \* \* \*

"You have heard testimony to the effect that there were other, better materials available for use in tile floors of entrances. You are not to use this evidence as the standard of due care, but it is an element which you may consider in determining what a reasonably prudent man would have done under similar circumstances to see that the entrance was reasonably safe."

Given such circumscription of its purpose, the evidence was properly admitted under the rule followed in Hellweg v. Chesapeake & Potomac Telephone Co., 71 App.D.C. 346, 110 F.2d 546, and Hecht Co. v. Jacobsen, 86 U.S.App.D.C. 81, 180 F.2d 13.

Counsel for defendant Stanley Company contends that evidence of available safer methods or appliances is inadmissible in the absence of a preliminary showing that there have been prior accidents of which defendant had notice, relying on certain language in Chicago & Northwestern Ry. Co. v. Bower, 241 U.S. 470, at page 474, 36 S.Ct. 624, 60 L.Ed. 1107. A careful reading of that opinion discloses that the court is referring to the specific facts in the case under consideration, in which there was notice of prior accidents; and the decision cites as precedent for the rule there followed Washington & G. R. R. Co. v. McDade, 135 U.S. 554, 570, 10 S.Ct. 1044, 34 L.Ed. 235, a case in which there not only was no evidence of prior accidents but, on the contrary, evidence that the machinery in question had been operated in the same manner by others with safety.

Counsel rely on the case of Mullen v. Sensenbrenner Mercantile Co., Mo.Sup., 260 S.W. 982, 33 A.L.R. 176, in support of their contention that a verdict for defendants should have been directed, stating the facts in that case are identical with the case at bar. Assuming a directed verdict was correct in the Sensenbrenner case, it may be distinguished from the instant case on its facts. There the tile floor of the entrance "sloped upwards a little less than one inch to the foot from the inside edge of the sidewalk for a distance of about five feet, where it joined the floor of the store room proper." There is no mention of any unusual contour. Here, the floor of the en-

trance has a grade of 1 inch to 10 inches, plus a peculiar double slope with a dip or hollow in the central part.

■ Counsel contend the damages awarded by the jury are excessive in view of the fact that Mrs. Hilleary, the plaintiff, was 85 years of age at the time the accident occurred and is now 88. They contend that her life expectancy is "almost nil" or "not more than a year or so;" that the damages proved were at most $3,700; that there is no indication of suffering or disability or permanent injury of any consequence; that any permanency of injury is due more to old age than to the accident; that plaintiff had no earning power; and that the verdict is one of sympathy, based on mere speculation.

No evidence of plaintiff's life expectancy was introduced by either the plaintiff or the defendants. The jury had the benefit of observing the plaintiff at the counsel table throughout the trial and hearing her testify. It is reasonable to believe that they concluded that the plaintiff has a personal life expectancy of some years. Save for the hip injury and its consequences and deafness, she appeared to be in unusually good health and spirits for one of her age. The uncontradicted testimony was that before the accident she was able to render light household duties and did so, whereas since the injury she has needed assistance even in tending to her own needs, and must use a cane. The plaintiff testified that she was confined in a hospital for three weeks after the accident; that during the first week she experienced extreme pain, but thereafter had a very comfortable time and the pain settled down to an ache. She now suffers dull pain almost all of the time, which is worse in damp weather and more severe in the morning than at night. Her leg swells every day, and she requires assistance in rising in the morning. Plaintiff appeared to maintain a cheeerful attitude, minimizing rather than magnifying her present condition. It cannot be said that the jury had no evidence of disability, permanent injury, or pain and suffering. It is common knowledge that a broken hip is a major injury, and that in an old person it frequently hastens deterioration which otherwise would not have occurred until later.

It is the peculiar function of the jury to determine the amount of recoverable damages by their verdict. "In no case is it permissible for the court to substitute itself for the jury, and compel a compliance on the part of the latter with its own view of the facts in evidence, as the standard and measure of that justice which the jury itself is the appointed constitutional tribunal to award," unless the verdict is so excessive or outrageous with reference to all the circumstances of the case as to demonstrate that the jury have acted against the rules of law, or have suffered their passions, their prejudices, or their perverse disregard of justice to mislead them.[4] In view of the nature of the plaintiff's injury and in the light of all the testimony in this case, the court cannot say that the verdict is so excessive as to be beyond reason and to shock the conscience.

■ Counsel for the defendants contend that the verdict should not have been received, on the ground that the first juror polled showed that she was confused and that the verdict was not unanimous.

When the jury returned its verdict, the foreman announced that the jury found against both defendants in the sum of $22,000. Defense counsel requested that the jury be polled. The first juror, when polled, stated her verdict was "for the plaintiff, and *twenty* thousand dollars." There was an involuntary ripple of comment through the jury, the first juror looked confused and turned to the juror standing next to her, who said something to her which was inaudible to the court. Counsel for the defendant Earle stated to the court that the jurors should not discuss the verdict among themselves, at about which time the jury were silenced. The clerk then began the poll again, starting with the same juror, who clearly stated her finding was for the plaintiff against the two defendants in the sum of twenty-two thousand dollars. The poll was then concluded without any further dis-

4. Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729. See also Snodgrass v. Cohen, D.C.D.C., 96 F.Supp. 292, and cases there cited.

crepancy. The only juror who appeared to be at all confused as to the amount of the verdict was the first juror; and her first misstatement may be construed as a slip of the tongue in view of the fact that she unhesitatingly restated her verdict to conform with the verdict as given by the foreman.

This was obviously not a case of a dissenting juror, as in Bruce v. Chestnut Farms-Chevy Chase Dairy, 75 U.S.App.D. C. 192, 126 F.2d 224, but rather an embarrassed or nervous juror, who, when she unexpectedly heard her name called first on the poll, was startled and answered in confusion, stating a verdict which she did not intend and later corrected on being questioned carefully by the court. Under the circumstances, the misstatement did not indicate that the verdict was not unanimous or that there was need for further deliberation.

For the foregoing reasons, the defendants' motions for judgment notwithstanding the verdict or for a new trial are denied.